## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| DON ELVIN BOYD, | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| v. | § | Civil Action No.   3:14-CV-3621-B-BH |
| | § | |
| CAROLYN COLVIN, ACTING, | § | |
| COMMISSIONER OF THE SOCIAL | § | |
| SECURITY ADMINISTRATION, | § | |
| | § | |
| **Defendant.** | § | |

### FINDINGS, CONCLUSIONS, AND RECOMMENDATION

Pursuant to *Special Order 3-251*, this case has been referred for proposed findings of fact and recommendation for disposition. Before the Court are *Plaintiff's Brief*, filed January 27, 2015 (doc. 12), and *Defendant's Response Brief in Support of the Commissioner's Decision*, filed February 26, 2015 (doc. 14). Based on the relevant filings, evidence, and applicable law, the Commissioner's decision should be **AFFIRMED**.

## I.   BACKGROUND

### A.    Procedural History

Don Elvin Boyd (Plaintiff) seeks judicial review of a final decision by the Commissioner of Social Security (Commissioner) denying his claim for disability insurance benefits (DIB) under Title II of the Social Security Act and his claim for supplemental security income (SSI) under Title XVI of the Social Security Act.[2] On March 15, 2010, Plaintiff applied for DIB and SSI, alleging disability beginning on January 1, 2010, due to an injured back and hernia. (R. at 396, 398, 507.) His application was denied initially and upon reconsideration. (R. at 145-157.) Plaintiff requested

---

[2]  The background information is summarized from the record of the administrative proceedings, which is designated as "R."

a hearing before an Administrative Law Judge (ALJ), and he personally appeared and testified at a hearing on November 15, 2011. (R. at 162-64, 33-46.)  On April 3, 2012, the ALJ issued his decision finding Plaintiff not disabled.  (R. at 95-102.)  Plaintiff requested review of the ALJ's decision, and the Appeals Council granted his request for review.  (R. at 273-74, 108-111.)  It vacated the hearing decision and remanded the case for further evaluation of Plaintiff's  mood disorder, for further consideration of his maximum residual functional capacity, and to obtain evidence from a vocational expert regarding his limitations. (R. at 110.) Plaintiff then appeared and testified at another hearing on April 22, 2013, before a different ALJ. (R. at 47-70.) A supplemental hearing was held on November 7, 2013.  (R. at 71-87.)   On July 14, 2014, the second ALJ issued his decision finding that Plaintiff was not disabled prior to January 17, 2013, but that he became disabled on that date and continued to be disabled through the date of the ALJ's decision.  (R. at 116-127.)  Plaintiff requested review of the second ALJ's decision, and the Appeals Council denied his request for review on August 22, 2014, making the second ALJ's decision the final decision of the Commissioner.  (R. at 1-3.)  Plaintiff timely appealed the Commissioner's decision under 42 U.S.C. § 405(g).  (*See* doc. 1.)

B.   **Factual History**

1.   **Age, Education, and Work Experience**

Plaintiff was born on January 17, 1958, and was 55 years old at the time of the hearing on April 22, 2013.  (R. at 51, 396, 398, 503.)  He received his GED and had past relevant work as a meat cutter and a stock clerk.  (R. at 51, 61, 508.)

### 2.      Medical, Psychological, and Psychiatric Evidence[3]

On March 24, 2010, Plaintiff presented to the Veterans Affairs Medical Center (VAMC) for a vesting appointment.  (R. at 752.)  Harry Scher, a nurse practitioner, noted that he smoked one "ppd" for 39 years and consumed 3 to 4 beers per week.  (R. at 753.)  Plaintiff denied suicidal ideations, depression, insomnia, or flashbacks.  (*Id*.)  During a depression screening that same day, Plaintiff received a score of 0, indicating he was negative for depression.  (R. at 758.)

On November 10, 2010, Plaintiff presented to the VAMC complaining of stress and depression.  (R. at 706.)  Dr. Collin J. Vas, M.D., a staff psychiatrist, noted that Plaintiff had sought help for cocaine use in 2001, and that he went to jail in 2003.  (R. at 708.)  He attended rehabilitation in jail and had been sober since.  (*Id*.)  He lived with his girlfriend and had no source of income because he stopped working in January 2010, causing him to be stressed and depressed.  (*Id*.)  He woke up screaming in his sleep.  (*Id*.)  He stated that he never used drugs or alcohol.  (*Id*.)  He was honorably discharged from the army after only 4 years of service upon alleging mental and physical abuse.  (*Id.*)  He reported a horrible childhood that gave him poor self-esteem due to his mother's physical and verbal abuse.  (*Id*.)  He read the Bible, but he did not see himself being useful to society due to his back pain.  (*Id*.)  He became stressed out 1 to 2 times a week, and he did not want to talk to anyone during that time.  (*Id*.)  He felt depressed much of the week, and he had less energy and felt worthless and impatient during that time.  (*Id*.)

Dr. Vas noted that Plaintiff was sketchily dressed and neatly-groomed, not in major distress, not agitated, had no retardation, and was mildly anxious and depressed.  (R. at 709.)  His thinking was linear, his insight and judgment were intact, and he was not psychotic, suicidal, or homicidal.

---

[3]Because only Plaintiff's psychological and psychiatric impairments are at issue, physical medical evidence is noted only when it includes information relevant to the mental impairments at issue.

(*Id.*)  He was assessed with adjustment disorder with depressed mood and poor self-esteem since childhood.  (*Id.*)  Dr. Vas also prescribed him Bupropion for his depression.  (*Id.*)

He returned to Dr. Vas on December 8, 2010.  (R. at 727.)  He brought in a form from his attorney regarding social security disability benefits that he needed signed. (*Id.*)  Dr. Vas indicated on the form that Plaintiff suffered from adjustment disorder, was capable of working from a mental health standpoint, and was not mentally disabled.  (*Id.*)  Plaintiff reported that he was more relaxed and was sleeping better at night.  (*Id.*)  His girlfriend, who attended the visit with him, reported that he did not appear stressed out to her.  (*Id.*)  They smoked cigarettes, and Plaintiff tended to overeat when he was stressed.  (*Id.*)  He acknowledged that his mental health problems were secondary to unemployment, having back problems, and not having an income.  (*Id.*)  Dr. Vas noted that Plaintiff's medical examination was almost normal and improved compared to his last examination. (R. at 728.)  Plaintiff behaved in a way that suggested borderline intellectual functioning, but he was neatly dressed and groomed, pleasant and cooperative, had an euthymic mood and affect, had linear thinking, had intact insight and judgment, and was not psychotic, suicidal, or homicidal.  (*Id.*)  Dr. Vas assessed him with adjustment disorder with mixed emotion and possible borderline intellectual functioning.  (*Id.*)  He advised him to continue taking his Bupropion.  (*Id.*)

On June 20, 2011, Plaintiff presented to Judy Robinson, a social worker at the VAMC, seeking help for his depression.  (R. at 783.)  He had just been released from jail after serving 4 months for domestic violence due to a physical altercation with his live-in girlfriend.  (*Id.*)  That was not his first arrest for domestic violence.  (*Id.*)  He was living with a female friend at that time and planned to apply for housing assistance with the VA.  (R. at 784.)  He informed Ms. Robinson that he was physically abused by his mother as a child and had frequent dreams and nightmares related to the abuse.  (*Id.*)  He also had fleeting thoughts of suicide but had no plans or intent to act on those

thoughts. (*Id.*) Ms. Robinson noted that he drank 6 beers, 3 to 4 times a week, and smoked 7 cigarettes a day. (*Id.*) Upon examination, his grooming, dress and motor activity was normal. (R. at 786.) His mood was depressed and his affect was anxious. (*Id.*) He was logical, sequential, and goal-directed. (*Id.*) She educated him regarding suicide risk/protective factors. (*Id.*)

That same day, Plaintiff saw Lesvegas Wooden, a registered nurse, to get help with his mood swings, depression, and anxiety. (R. at 788.) He reported that others told him he was worthless, and he got paranoid when he was around people. (*Id.*) He received information regarding anger management. (*Id.*)

On July 5, 2011, Plaintiff met with Donald King, a peer support technician, at the VAMC. (R. at 774.) He told Mr. King that he had just been released from jail for domestic violence, and he had no money because he was unable to work. (*Id.*) He had applied for social security disability benefits, and his application was still pending. (*Id.*) He needed transportation to and from the VA, but he could manage everything else. (*Id.*) Mr. King referred him to social services for information about securing money to purchase a bus pass. (R. at 775.)

He also met that day with Danielle Young, a social worker, who informed him that he was eligible for travel reimbursement for scheduled physician appointments and emergency room visits. (R. at 782.) He told her he was on probation and had a restraining order against him. (*Id.*) He was also receiving $200 a month in food stamps. (*Id.*)

On July 6, 2011, he again met with Ms. Robinson. (*Id.*) He told her he was depressed due to the 4 months he spent in jail for domestic violence. (*Id.*) Although he was unable to give Ms. Robinson any specific details related to his depression, he told her he was physically abused by his mother as a child and continued to have dreams and nightmares related to the abuse. (*Id.*) He was well-groomed, cooperative, easily engageable, and had no psychomotor abnormalities or abnormal

5

movements.  (R. at 779.)  His mood was anxious, his affect was mood congruent, and his thought-process was coherent and goal-directed.  (R. at 779.)

On May 9, 2012, Plaintiff requested from his primary care physician at the VAMC renewal of his stress pill, which was last refilled in December 2010.  (R. at 968.)

On June 25, 2012, Plaintiff presented to Gloria Emmett, a clinical psychologist at the VAMC, describing being highly stressed due to legal, housing, and financial issues.  (R. at 961.) His primary concern was the denial of his social security disability application approximately 12 months prior.  (*Id*.)  He reported feeling "stressed and down."  (*Id*.)  He requested substance abuse treatment because his parole officer required it, although he was not abusing substances.  (R. at 965.) He was assessed with adjustment disorder, and Ms. Emmett helped him get a psychiatrist appointment.  (*Id*.)

On August 1, 2012, Plaintiff presented to Dr. Bettina Fehr, M.D., a staff psychiatrist at the VAMC, for supportive therapy and medication management.  (R. at 1140.)  Dr. Fehr noted that Plaintiff was trying to obtain social security disability benefits for his back problems, he had stopped working in January 2010 due to his back problems, and he was on probation for choking his girlfriend.  (*Id*.)  He reported abuse from his sergeant in the army who hit him in the mouth, made him do extra exercises, and made racial slurs.  (*Id*.)  Plaintiff had attempted suicide only once at the age of 19, and his mother was emotionally and physically abusive.  (*Id*.)  Dr. Fehr noted that he made good eye contact, was cooperative and appropriate, and alert and oriented to person, place and time. (R. at 1142.)  His depression was a 8.5 out of 10, and he was tired all the time and had feelings of worthlessness.  (*Id*.)  His anxiety was a 8-9 out of 10, and he worried a lot, had problems with crowds, was jumpy at noises, and had a fear of being criticized.  (*Id*.)  He sometimes had partial symptoms of panic attacks out of the blue, during stress, or in crowds.  (*Id*.)  He was goal-oriented

and logical.  (*Id*.)  He denied suicidal and homicidal ideations.  (*Id*.)  He was negative for auditory, olfactory, and sensory hallucinations, but he had visual hallucinations of dark figures in his periphery.  (*Id*.)  He only received 3-4 hours of sleep per night.  (*Id*.)  He had initial insomnia and a fear of dying if he went to sleep, and he woke up gasping for air at night.  (*Id*.)  She assessed him with major depressive disorder, and suspected PTSD.  (*Id*.)  She prescribed Bupropion for his depression.  (*Id*.)

Plaintiff met with peer support technician, Ronald Robertson, on August 2, 2012, to discuss issues related to housing.  (R. at 1246.)  He was neatly groomed, alert, "oriented x3", and in a good mood.  (R. at 1247.)  He showed no signs of having cognitive deficits, and he did not verbalize suicidal or homicidal thoughts.  (*Id*.)

On August 22, 2012, Plaintiff went with Ms. Robinson to receive clothing and shoe assistance though "Operation Once in a Lifetime."  (R. at 1238.)  Ms. Robinson noted that he presented in dress attire, he was alert and oriented, his mood was elevated with incongruent affect, and his speech was pressured with tangential thought process and marginal judgment.  (R. at 1239.)

On September 6, 2012, Plaintiff underwent a psychological assessment with social worker Catriska Robertson.  (R. at 1235.)  She noted that Plaintiff had no interest in working until his social security disability claim was approved, and he had difficulty verbalizing how he would pay his portion of rent for his upcoming apartment.  (*Id*.)  He reported a continuous theme of having no self worth due to the abuse he endured during childhood and his time in the military.  (*Id*.)  He admitted to having depression due to the abuse and negative feedback he received in his life.  (*Id*.)  He also reported drug use, but advised that he had not received any formal substance abuse treatment.  (*Id*.)  He did not have peer support from other veterans, and Ms. Robertson noted that he appeared to be somewhat uncomfortable around his peers at times.  (*Id*.)  He openly communicated with staff and

appeared to have difficulty with social skills and processing.  (*Id.*)

After a phone call with Plaintiff regarding his housing options on September 18, 2012, Ms. Robertson noted that he had an anxious mood, his speech was pressured and his thought process was circumstantial.  (R. at 1228-1229.)  Plaintiff did not verbalize having a recent episode of depression and denied thoughts of suicidal or homicidal ideation.  (*Id.*)

On September 24, 2012, Plaintiff met with Ms. Robertson for help securing housing.  (R. at 1220.)  She noted that he appeared alert and oriented with an anxious mood, was neatly dressed, made eye contact, had clear speech, and had circumstantial thought process.  (*Id.*)

On October 9, 2012, Plaintiff reported to Ms. Robertson that he received a call from an apartment complex informing him that he had been approved for housing.  (R. at 1201.)  He did not verbalize a recent episode of depression and denied suicidal or homicidal ideation.  (*Id.*)

On October 24, 2012, Plaintiff met with Karen Wright, a social worker at the VAMC,  for his monthly case management meeting.  (R. at 1200.)  He was preparing to move into his new apartment and was awaiting an apartment inspection from the housing authority.  (*Id.*)  He needed a source of income to offset his portion of the rent while his social security disability case was pending.  (*Id.*)  He reported that he would feel good about himself if he received employment.  (*Id.*)  He also reported that he had been taking his medication as prescribed and had not had an appointment with his mental health or medical provider to report side effects and sexual dysfunction.  (*Id.*)  The side effects of his medication were dry mouth, jitteriness, agitation, fast heart rate, constipation, increased sweating, and nervousness.  (*Id.*)  Finally, he reported that he had not found coping strategies to help deal with his anger and frustration, which were triggers for his depression.  (*Id.*)  Ms. Wright found that he was neatly groomed, appeared alert and oriented, had a pleasant mood, made eye contact, had clear speech and circumstantial thought process.  (*Id.*)  He did not

verbalize having a recent episode of depression, and he denied thoughts of suicide or homicidal ideation. (*Id.*)

On November 6, 2012, Plaintiff presented to the VAMC and saw Ms. Wright for his monthly case management meeting. (R. at 1195.) He had not had an appointment with his mental health or medical provider in several months, but he was taking all medications as prescribed. (*Id.*) He expressed interest in obtaining part-time temporary work to assist him in paying his portion of his rent until he heard back from the Social Security Administration. (*Id.*) He was homeless and spent his nights with his mother or with friends. (*Id.*) Plaintiff was neatly groomed, appeared to be alert and oriented, had a pleasant mood, made eye contact, had clear speech, and had circumstantial thought process. (*Id.*) He did not verbalize having a recent episode of depression and denied suicidal and homicidal ideation. (*Id.*) He was able to process his thoughts and feelings to Ms. Wright. (*Id.*) She educated him on the importance of scheduling appointments with his mental health physician. (*Id.*)

On November 26, 2012, Plaintiff met with Ms. Wright for his monthly case management meeting in order to review and work on his rehabilitative goals. (R. at 1191.) He reported that he had stopped taking his medication to stabilize his mood two weeks prior, was utilizing coping strategies, and had had no mood or depressive symptoms within the last 30 days. (R. at 1191.) He had not visited his mental health provider since August 2012. (*Id.*) He was a 8 out of 10 on a scale of 1 to 10, with 10 being the best things could be going. (*Id.*) He believed that he would reach a 9 or a 10 once he obtained housing. (*Id.*)

That same day, Ms. Wright contacted Plaintiff's probation officer regarding Plaintiff's contention that the officer would not provide him with bus passes to attend scheduled appointments. (R. at 1188.) The probation officer reported that he had provided Plaintiff with bus passes in the

past. (*Id.*) Plaintiff, however, was required to meet with him bi-weekly, and he had not been compliant or completed any task that he assigned him to do. (*Id.*) His agency only issued them to clients that were compliant. (*Id.*)

Plaintiff returned to the VAMC on December 5, 2012, for job development and resume building with LaKeysa Townsend, a vocational rehabilitation specialist. (R. at 1175.) He reported that his SSDI was in the process of being approved, and he did not want to do anything to affect it. (*Id.*) He was moving into his apartment soon and would need to pay at least $50 a month. (*Id.*) Ms. Townsend noted that Plaintiff's appearance was presentable, and he made good eye contact. (*Id.*) He responded well to questions about his background and employment experiences. (*Id.*)

He met with Ms. Wright on December 18, 2012 and reported that he had not been taking his medications as prescribed. (*Id.*) He would start taking medications, however, such as Bupropion, to help with his mood disorder, frustration, and anger and to prevent a relapse. (*Id.*) She educated him on the side effects of medication. (*Id.*)

On January 2, 2013, Plaintiff met with Ms. Robertson to sign the lease for his new apartment. (R. at 1267.) He presented in casual attire, he was alert and oriented, his mood was anxious with congruent affect, he had pressured speech with circumstantial thought process, and he had poor eye contact. (*Id.*) He was open to suggestions and appeared to understand the leasing process. (*Id.*)

Plaintiff met with Dr. Fehr on January 10, 2013. (R. at 1269.) He reported that his depression was slightly better, but he was only taking 100 milligrams of Wellbutrin, which was a low dose. (R. at 1270.) He drank 2 to 3 beers once or twice a month and smoked a pack of cigarettes each day. (*Id.*) She noted that he made good eye contact, was cooperative and appropriate, had a cane, and was alert and oriented to person, place, and time. (*Id.*) His depression was a 7-8 out of 10, and he was tired all the time and felt worthless. (R. at 1271.) His anxiety was

a 8-9 out of 10, and he worried a lot, had problems with crowds, jumped at loud noises, and had a fear of being criticized.  (*Id.*)  He was goal-oriented and logical, experienced visual hallucinations, and slept 7-8 hours each night.  (R. at 1270-1271.)  She conducted medication reconciliation and prescribed Trazodone for his sleep.  (R. at 1271.)

On January 14, 2013, Plaintiff presented to the VAMC to request assistance in obtaining a bus pass to get to his doctor's appointment the next day.  (R. at 1272.)  Ms. Robinson noted that he presented with an anxious mood, pressured speech, and circumstantial thought process with marginal judgment and insight.  (*Id.*)

On January 28, 2013, Plaintiff met with Ms. Townsend for job development and resume building as well as with Amanda Lewis, a peer support technician, for transportation to "Operation Once in a Lifetime."  (R. at 1311-1312.)  Ms. Lewis noted that Plaintiff was pleasant, appropriate, neatly groomed, alert, oriented, and in a good mood.  (R. at 1312.)  Plaintiff showed no signs of cognitive deficits and did not verbalize having suicidal or homicidal thoughts.  (*Id.*)

Plaintiff met with Ms. Townsend again on February 11, 2013, for job development and resume building.  (R. at 1293.)  He shared information about his background in order to help develop an employability report.  (*Id.*)  He was presentable and made good eye contact.  (R. at 1294.)  He also responded well to questions about his background and employment experience.  (*Id.*)

On February 28, 2013, Ms. Robertson referred Plaintiff to a Mental Health Wellness Recovery Action Plan (WRAP) group.  (R. at 1288.)  She noted Plaintiff's diagnoses of major depression, and his recurrent and continuous symptoms of helplessness, loneliness, and fatigue.  (*Id.*)  She found that he tended to exhibit grandiose behaviors and would require redirection.  (*Id.*)

On March 5, 2013, Plaintiff saw Ms. Townsend in order to finish his criminal background information for an employability report.  (R. at 1284.)  She found that his appearance was

presentable, he made good eye contact, and he responded well to questions about his background and employment experience.  (R. at 1285.)

Plaintiff met with Ms. Robertson on March 6, 2013, for treatment planning, and he reported difficulty sleeping.  (R. at 1283-1284.)  His mood was calm with congruent affect, his speech was normal, and he had circumstantial thought process with marginal judgment and insight.  (*Id*.)

On March 26, 2013, Ms. Robertson delivered 3 bus passes to Plaintiff at his home.  (R. at 1422.)  He admitted to not taking his medication, and Ms. Robertson found that he appeared to have some cognitive deficits.  (R. at 1422-1423.)  He also appeared disheveled, and his thought process was circumstantial with marginal judgment and insight.  (R. at 1423.)

On April 2, 2013, Plaintiff informed Ms. Robertson during a home visit that he did not plan to attend substance abuse treatment, but he wanted to show his probation officer that he enrolled.  (R. at 1427.)  Ms. Robertson counseled him on dishonesty and encouraged him to attend treatment.  (*Id*.)  He was able to acknowledge that drug use and drinking with anger control problems were key components in his recent domestic violence felony, but Ms. Robertson found that he was still in denial.  (R. at 1428.)

On April 12, 2013, Dr. Fehr met with Plaintiff for supportive therapy and medication management.  (R. at 1419.)  Plaintiff reported that he still felt depressed and anxious all the time, could not tolerate crowds, and got panic attacks when he wanted to go to sleep.  (*Id*.)  He slept poorly due to a fear of dying in his sleep, and he often woke up with panic attacks.  (*Id*.)  Dr. Fehr noted that he made good eye contact, was cooperative and appropriate, ambulated with a cane, and was alert and oriented to person, place, and time.  (*Id*.)  His depression and anxiety were both an 8 out of 10.  (R. at 1420.)  He had nightmares 3 times a month and lost weight due to stress.  (*Id*.)  She assessed him with ongoing depression, anxiety, and panic attacks and prescribed him 50 milligrams

of Sertraline and Prazosin.  (R. at 1420-21.)

That sane day, Dr. Fehr also completed an Psychiatric/Psychological Impairment Questionnaire.  (R. at 1322-1329.)  She gave diagnoses of major depressive disorder; anxiety disorders, NOS (panic disorder or post-traumatic stress disorder with panic attacks); chronic back pain, sleep apnea, hyperlipidemia attacks, and pre-diabetic. (R. at 1322.) She found his impairments were severe, he was not able to work, he had no income, he was homeless, and he had no social support.  (*Id*.)  She assessed a current Global Assessment of Functioning (GAF) score of 45, with his lowest GAF in the past year being 40.  (*Id*.)  His prognosis was guarded, and she noted that his depression affected his medical problems, and his anxiety was exacerbated under stress and contributed to his social difficulties.  (*Id*.)  She listed clinical findings that demonstrated and supported her diagnoses: appetite disturbance with weight change, sleep disturbance, mood disturbance, emotional liability, recurrent panic attacks, feelings of guilt/worthlessness, difficulty thinking or concentrating, perceptual disturbances, social withdrawal or isolation, decreased energy, persistent irrational fears, generalized persistent anxiety, hostility and irritability, nightmares, hypervigilance in crowds, panic attacks in social situations, isolation, and avoidance behavior.  (R. at 1323.)  As support for her diagnoses, she simply referred to "labs from VA records."  (*Id*.)  Dr. Fehr listed his primary symptoms as depression and anxiety, panic attacks, sleep problems, and chronic pain.  (R. at 1324.)  She noted that he did not require hospitalization or emergency room treatment for his symptoms, and his symptoms and functional limitations were reasonably consistent with his physical and/or emotional impairments.  (*Id*.)  She found that he was markedly limited in his ability to carry out detailed instructions, his ability to maintain attention and concentration for extended periods, his ability to perform activities within a schedule, maintain regular attendance, and be punctual with customary tolerance; and in his ability to work in coordination with or

proximity to others without being distracted by them.  (R. at 1325.)  He was also markedly limited in his ability to interact appropriately with the general public and in his ability to get along with co-workers or peers without distracting them or exhibiting behavioral extremes.  (R. at 1326.)  She found that Plaintiff was not limited, mildly limited, and  moderately limited in various areas of understanding and memory, sustained concentration and persistence, social interactions, and adaptation.  (R. at 1322-1327.)

Dr. Fehr found that Plaintiff experienced episodes of decompensation or deterioration in work or work-like settings that caused him to withdraw from the situation or experience exacerbation of symptoms because he might miss several days of work a month.  (R. at 1327.)  She noted that he had many medical problems that affected his mental health and performance, and his psychiatric condition exacerbated his pain or other physical symptoms.  (R. at 1327-1328.)  Plaintiff could tolerate only low work stress due to his ongoing problems with depression and anxiety, which got worse under stress to the point where he would undergo panic attacks, irritability, or fear of losing control.  (R. at 1328.)  She estimated that he was likely to be absent from work more than 3 times a month and that his impairments were expected to last at least 12 months.  (R. at 1328-1329.)  She opined that January 2010 was the earliest date of his symptoms and limitations. (R. at 1329.)

Dr. Fehr also opined that Plaintiff was totally disabled without consideration of any past or present drug and/or alcohol use.  (R. at 1331.)  She noted that he was currently not using drugs and remained disabled.  (*Id*.)

On April 17, 2013, Plaintiff met with Ms. Robertson and identified his "chief complaint" as wanting to be self-sufficient and maintain his housing.  (R. at 1407.)  Ms. Robertson noted that Plaintiff was able to perform activities of daily living without assistance.  (R. at 1408.)  Ms. Robertson and Plaintiff agreed that he had reached his maximum potential benefit from his treatment

program.  (R. at 1410.)

On May 14, 2013, Ms. Robertson noted that while being transported to a Wellness Self Management (WSM) group, Plaintiff had normal speech, circumstantial thought process and marginal judgment and insight.  (R. at 1389-1390.)  On May 15, 2013, Plaintiff met with Ms. Lewis for transportation to his WRAP group.  (R. at 1381.)  She noted that he was committed to recovery, was neatly groomed, ambulated with a cane, and showed no signs of having cognitive deficits.  (*Id.*)

On May 24, 2013, Dr. Barbara Felkins, M.D., completed a Medical Source Statement of Ability to Do Work-Related Activities.  (R. at 1342.)  She found Plaintiff not limited in understanding, remembering, and carrying out simple instructions; markedly limited in understanding, remembering, and carrying out complex instructions; and moderately limited in his ability to interact appropriately with supervision, co-workers, and the public as well as respond to changes in a routine work setting.  (R. at 1342-1343.)  The limitations were first present on January 1, 2010, and although she found some evidence of alcohol abuse, she made her findings without consideration of any drug or alcohol abuse.  (R. at 1343.)

Dr. Felkins also completed medical interrogatories based on her review of the record.  (R. at 1345.)  She found that Plaintiff's impairments were major depression, PTSD, and borderline intellectual functioning.  (R. at 1345.)  She opined that Plaintiff had no restrictions in activities of daily living; moderate difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence or pace; and mild repeated episodes of decompensation, each of extended duration.  (R. at 1346.)  She found that his impairments, combined or separately, did not meet or medically equal the criteria for impairment described in the Listing of Impairments.  (R. at 1347.)

Dr. Felkins noted that Plaintiff's psychiatric treatment had been very spotty and intermittent.

(*Id.*)   He sought evaluation and was diagnosed with adjustment disorder but started on an antidepressant and was doing better by December 8, 2010. (*Id.*) His psychiatrist refused to state that he was disabled. (*Id.*) She also noted that he went to jail for domestic violence caused by alcohol use and started back again on antidepressants. (*Id.*) He was seen again on June 25, 2012, about one year later. (*Id.*) His antidepressants had not been filled since December of 2010, and his psychiatrist again refused to declare him disabled as did his primary care physician. (*Id.*) Further, he saw another psychiatrist on August 1, 2012, who changed his diagnosis from adjustment disorder to major depression and PTSD and restarted his antidepressant. (*Id.*) He stopped taking the antidepressant on November 26, 2012, because he had no depression. (*Id.*) Plaintiff saw a psychiatrist again on January 10, 2012, for his sixth total visit in over 2 years. (*Id.*) He felt somewhat better at that time although he had not taken the proper dosage of his antidepressant. (*Id.*) Dr. Felkins noted that the psychiatrist, Dr. Fehr, assigned a "disability RFC" but did not comment about his gross noncompliance. (*Id.*) He found that Dr. Fehr's progress notes did not support her RFC finding. (*Id.*) Finally, Dr. Felkins noted that Plaintiff mainly stated he drank very little, but on June 20, 2011, it was noted that he drank 6 beers a day, 3 to 4 times a week. (*Id.*)

On July 3, 2013, Plaintiff met with Ms. Robinson. (R. at 1366.) He complained of feeling depressed in the last 30 days, but he was taking his medication as prescribed. (*Id.*) He had been actively engaged in a WSM group in order to improve his coping skills and manage his depression and recovery, and his self-esteem had increased since he began the group. (*Id.*) Ms. Robinson encouraged him to be more positive about his outlook in life. (*Id.*)

On August 1, 2013, Plaintiff reported to Ms. Robertson that he had had no episodes of depression over the last 90 days, and his mood had improved since his admission to the WSM group. (R. at 1524.)

16

Plaintiff had another session with Dr. Fehr on August 21, 2013.  (R. at 1493.)  Plaintiff still felt depressed and had anxiety, had panic attacks on the bus sometimes, and continued to have poor sleep.  (R. at 1494.)  He claimed to drink 3 beers a month, which made him feel worse.  (*Id*.)  His depression was a 5-6 out of 10, and his anxiety was a 7-9 out of 10.  (R. at 1495.)  Dr. Fehr increased his dosage of Sertraline.  (*Id*.)

### 3.      April 3, 2012 Decision[4]

The ALJ issued his decision denying benefits on April 3, 2012. (R. at 95-102.)  At step one,[5] he found that Plaintiff had not engaged in substantial gainful activity since January 1, 2010, his alleged onset date.  (R. at 96.)  At step two, he found that Plaintiff had two severe impairments: degenerative disc disease and mood disorder.  (*Id*.)  Despite those impairments, at step three, he found that Plaintiff had no impairment or combination of impairments that met or equaled the severity of one of the listed physical or mental impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (doc. 97-98.)  Next, the ALJ determined that Plaintiff had the RFC to perform a range of medium work as defined in 20 C.F.R. § 404.1567(a) that would reasonably restrict him to lifting 20 pounds occasionally, 10 pounds frequently; stand/walk 6 hours in an 8-hour workday, and sit 6 hours in an 8-hour workday.  (R. at 98.)  At step four, he found that Plaintiff was capable of performing past relevant work within the assigned RFC as a security guard and a meat cutter.  (R. at 102.)  Accordingly, the ALJ determined that Plaintiff had not been under a disability, as defined by the Social Security Act, from his onset date through the date of the ALJ's decision.  (*Id*.)

---

[4]The ALJ issued this decision following a November 15, 2011 hearing.  (R. at 33-46.)  Plaintiff, who was represented by an attorney, and a vocational expert, testified at the hearing.  (*Id*.)  Plaintiff's mental limitations were not discussed during this hearing.

[5]The references to steps refer to the five-step analysis used to determine whether a claimant is disabled under the Social Security Act, which is described more specifically below.

### 4.    November 20, 2012 Order of Appeals Council

On November 20, 2012, the Appeals Council issued an order vacating the ALJ's April 3, 2012 decision and remanding the case to an ALJ.  (R. at 109.)  The Council noted that the ALJ's RFC assessment was contradictory because it stated that Plaintiff had the RFC to perform a medium range of work, but the limitations in the RFC indicated a finding of light work.  (*Id*.)  This contradiction warranted further evaluation of Plaintiff's RFC.  (*Id*.)  It also noted that although the ALJ found that Plaintiff had a severe mood disorder, he failed to include any limitation addressing it in his RFC.  (*Id*.)  Further, the Appeals Council noted that the ALJ failed to adequately evaluate the paragraph "B" criteria[6], so further evaluation was needed to determine the severity of Plaintiff's mental impairment and any resulting limitation.  (R. at 110-111.)

The Appeals Council ordered the ALJ to further evaluate Plaintiff's mood disorder in accordance with the special technique described in 20 C.F.R. § 404.1520a and 416.920a; give further consideration to Plaintiff's maximum RFC; and obtain supplemental evidence from a vocational expert to clarify the effect of the assessed limitation on Plaintiff's occupational base.  (R. at 110.)

Finally, the Appeals Council required the ALJ to offer Plaintiff an opportunity for a hearing, address the evidence that was submitted with the request for review, take any further action needed to complete the administrative record, and issue a new decision.  (*Id*.)

### 5.    April 22, 2013 Hearing

On April 22, 2013, Plaintiff and a vocational expert (VE) testified at a hearing before the ALJ.  (R. at 47-87.)  Plaintiff was represented by an attorney.  (R. at 47.)

---

[6]If a claimant has a mental impairment, at steps two and three, the ALJ "must ... evaluate the degree of functional loss resulting from the impairment in four separate areas deemed essential for work." *Boyd*, 239 F.3d at 705 (citing 20 C.F.R. § 404.1520a(b)(3)).  These functional areas (known as the "paragraph B criteria") are: (1) activities of daily living; (2) social functioning; (3) concentration, persistence, and pace; and (4) episodes of decompensation.  20 C.F.R. § 404.1520a(c)(3) (2011); 20 C.F.R. Pt. 404, Subpt. P. App. 1, § 12.00C.

The ALJ first stated that the hearing was a remand of a hearing that was held with another ALJ, and that he would address the issues raised by the Appeals Council by going through the case as he normally did with a new case.  (R. at 50.)

### a.    Plaintiff's Testimony

Plaintiff was 55 years of age at the time of the hearing.  (R. at 51.)  He had not worked, received Worker's Compensation benefits, or received unemployment benefits since his alleged onset date of January 1, 2010.  (*Id*.)  He received his GED.  (*Id*.)  He was right-handed; 5 feet, 8 inches tall; and weighed about 216 pounds.  (R. at 52.)  He was not married, lived alone, and had a driver's license.  (*Id.*)  Although he was physically able to drive, he caught a "bus or train" to the hearing.  (R. at 53.)  He was in the army for about 3 or 4 months before being honorably discharged.  (*Id*.)  He believed he was honorably discharged because he threatened to report that his drill sergeant was abusing him.  (*Id*.)

He testified that he did not drink alcohol and never had a problem with it.  (*Id*.)  He used crack cocaine in the past.  (R. at 24.)  He smoked about a half a pack of cigarettes a day.  (*Id.*)

He had a hernia and an injured back.  (R. at 52.)  He also had severe pain in his thigh, joint, and leg.  (*Id*.)  He had pain in his lower back that traveled from his back into his hips and both legs.  (R. at 54.)  Walking and bending down to tie his shoe and put on his socks aggravated his pain.  (R. at 54-55.)  He started using a cane prescribed by his doctor in 2011.  (R. at 55.)  He had pain and problems with balancing.  (*Id.*)  The medication he took for his back pain, especially the muscle relaxers, made him feel weird and sleepy.  (R. at 56.)  He also had pain standing, and when he stood up, the joints in his right thigh and leg ached "like arthritis and stuff and pain be shooting in my back over by the L4 and L5."  (R. at 57.)

He was able to stand for about 25 or 30 minutes before he needed to sit, even with his cane.

(R. at 57.)  He could walk for about half a mile, probably less, before needing to take a break, and

he was able to sit for about 30 minutes before he started to squirm around to alleviate the pain in the

center of his back.  (R. at 57-58.)  He had problems reaching due to his back, and he could lift maybe

about 5 or 10 pounds. (R. at 58.)

He was being treated for depression and took medication for it.  (*Id.*)  When he was

depressed, he felt worthless and without purpose because he could not work.  (R. at 58-59.)  He was

always sad, had no energy, and wanted to hide in a hole.  (R. a 59.)  He was not involved in any

activities, and he had difficulty being around people.  (*Id.*)  He had anxiety attacks when he was in

a crowd of people.  (*Id.*)

Plaintiff believed that he was unable to work because of the pain in his back.  (R. at 60.)  He

could not pull, tug, or move anything.  (*Id.*)

### b.   *VE's Testimony*

The VE classified Plaintiff's past relevant work as a meat cutter (SVP:6, heavy, skilled, DOT

316.684-018); a stock clerk (SVP:2, medium, unskilled, DOT 922.687-058); and a security guard

(SVP:3, light, semi-skilled, DOT 372.667-034).[7]  (R. at 61.)

The ALJ asked the VE to opine whether a hypothetical person who is 55 years old with a

GED could perform Plaintiff's past relevant work if he could perform no greater than medium work

- occasionally stoop, crouch, crawl, kneel, and balance; occasionally climb stairs;  never climb

ladders; and due to psychological-based factors, was able to understand, remember, and carry out

detailed but not complex instructions; could sustain concentration and persistence for sufficient time

to complete detailed tasks; was able to interact appropriately with supervisors and co-workers but

---

[7]The ALJ subsequently eliminated Plaintiff's work as a security guard as his past relevant work because it
occurred too far back.  (R. at 76.)

had only occasional incidental contact with the public.  (R. at 61-62.)  The VE testified that the past relevant work as a stock clerk would be available.  (R. at 62.)  She would eliminate the meat cutter position due to the exertional limitation as well as the security guard position based on the nonexertional limitation for only occasional interaction with people.  (*Id.*)

The ALJ modified the hypothetical to include a light exertional level with the same limitations as in the previous hypothetical.  (*Id.*)  The VE testified that the hypothetical person could not do any of Plaintiff's past relevant work, and there would be no transferable skills.  (R. at 62-63.)

There would be no available jobs for a person who was advanced in age.  (R. at 63.)  For a hypothetical individual closely approaching advanced age, the light, unskilled occupational base[8] of 1,570 would "erode" to approximately 1,155 remaining classifications available.  (*Id.*)  One example of the occupational base would include a position as a cleaner or housekeeper (SVP:2, light, DOT  323.687-014), with 52,000 jobs in Texas and 2,000,000 jobs nationally.  (R. at 63-64.)

The ALJ modified the hypothetical to include a sedentary level of exertion with the same limitations as in the previous hypotheticals.  (R. at 64.)  Considering a younger individual, the occupational base was reduced to 112 classifications.  (*Id.*)  The VE gave an example at the sedentary, unskilled occupational base of a dowel inspector (SVP:2, sedentary, DOT 669.687-014), with 3,187 jobs in Texas and 65,000 nationally.  (*Id.*)  There would be no transferability for an individual approaching advanced age.  (R. at 69.)

The ALJ next modified the last hypothetical to add a requirement that the individual be allowed to take breaks at will or to take 5 minute breaks every 15 minutes.  (R. at 63.)  The VE testified that the additional limitation would preclude all work in the national economy.  (R. at 64.)

---

[8]The term "occupational base" means the approximate number of occupations that an individual has the RFC to perform.  Social Security Regulation (SSR) 83-10, 1983 WL 31251, at *7 (1983).

She also testified that the jobs she cited were consistent with the descriptions in the DOT. (R. at 63-64.)

Plaintiff's attorney asked whether an individual who was limited to lifting and carrying up to 10 pounds, who could stand and walk 2 hours out of an 8-hour workday, and who could sit for 2 hours out of an 8-hour work-day would be able to maintain full-time employment. (R. at 65.) She testified that these limitations would be consistent with part-time employment. (*Id.*) He then directed the VE back to the ALJ's second hypothetical, which provided for a light RFC. (*Id.*) He asked if an individual that was unable to maintain attention and concentration for extended periods, unable to carry out detailed instructions, and unable to work in coordination with or proximately to others without being distracted by them, would be able to maintain the jobs she mentioned. (R. at 65-66.) The VE testified that these limitations would preclude any type of work in the national economy. (R. at 66.)

### 6.    November 7, 2013 Hearing

On November 7, 2013, Plaintiff, a medical expert (ME)[9], and a VE testified at a hearing. (R. at 72-87.) Plaintiff was again represented by an attorney. (R. at 73.)

#### a.    *VE's Testimony*

The ALJ noted that out of the three past relevant jobs of meat cutter, stock clerk, and security guard identified by the VE at the April 22, 2013 hearing, he eliminated the security guard job. (R. at 82.) He believed that enough time had passed, and the job was no longer relevant. (*Id.*)

The VE testified that the job of the meat cutter was heavy and unskilled, with a SVP of 6. (R. at 83.) He found that the position of a stock clerk, which he referred to by its alternate title of

---

[9]Plaintiff's testimony at this hearing was duplicative of his testimony at the April 22, 2013 hearing, and the ME's testimony related to a physical impairment. The substance of the testimony is therefore not recounted here.

warehouse worker, was medium and unskilled,  with a SVP of 2.  (*Id.*)

The ALJ then presented a hypothetical at the light exertional level with the following limitations: occasionally stoop, crouch, crawl, kneel, balance; occasionally climb stairs; never climb ladders; occasional exposure to temperature extremes, dust, fumes, gases, and other pulmonary irritants; must avoid heights and dangerous moving machinery; some limitation on psychological-based factors but able to understand, remember, and carry out simple instructions; sustain concentration and persistence for sufficient time to compete simple tasks; able to interact appropriately with supervisors; occasional contact with co-workers and public incident to the work performed; and able to respond appropriately to changes in the workplace. (R. at 83-84.)  The VE testified that a hypothetical person with those limitations could not do Plaintiff's past work, and there were no transferable skills.  (R. at 84.)  There were, however, other jobs that such a person could do such as a marker (SVP:2,  light, unskilled, DOT 209.587-034), with 3,200 jobs in Texas and 42,600 jobs nationally; and an air purifier servicer (SVP:2, light, unskilled, DOT 389.687-010), with 2,900 jobs in Texas and 40,000 jobs nationally.  (R. at 85.)

The ALJ modified the hypothetical to include a sedentary level of exertion with the same limitations.  (*Id.*)  The VE testified that other jobs that could be performed by such hypothetical person were an addresser (SVP:2, sedentary, unskilled, DOT 209.587-010), with 1,100 jobs in Texas and 24,700 nationally; and a cutter and paster of press clippings (SVP:2, sedentary, unskilled, DOT 249.587-014), with 2,300 jobs in Texas and 32,400 nationally.  (*Id.*)  He again modified the hypothetical to add a requirement that the individual be allowed to take breaks at will - 10 minute breaks every 30 minutes.  (*Id.*)  The VE testified that there would be no jobs available with that additional limitation.  (*Id.*)  According to the VE, the jobs he cited were not inconsistent with the description in the DOT, but the DOT did not go into being off task or the type and extent of contact

with others.  (*Id.*)

Plaintiff's attorney asked whether an individual who was only able to sit for 5 minutes at a time before needing to stand would be able to maintain those jobs.  (R. at 86.)  The VE indicated that anything that required an individual to alternate sitting and standing every 10 to 15 minutes would preclude work.  (*Id.*)

### 7.    December 20, 2013 Decision

The ALJ issued his second decision denying benefits on December 20, 2013.  (R. at 116-127.)  At step one, he found that Plaintiff had not engaged in substantial gainful activity since his alleged onset date.  (R. at 119.)  At step two, he found that Plaintiff had five severe impairments: degenerative disc disease, hernia, depression, post traumatic stress disorder, and borderline intellectual functioning.  (*Id.*)  Despite those impairments, at step three, he found that Plaintiff had no impairment or combination of impairments that met or equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (*Id.*)  Next, the ALJ determined that Plaintiff had the RFC to lift/carry 20 pounds occasionally, 10 pounds frequently; sit/stand/walk for 6 hours out of an 8-hour workday; stoop, crouch, crawl, kneel, and balance occasionally; climb stairs occasionally; avoid climbing ladders; occasionally limited to working in temperature/humidity changes, dust, fumes, and gases; and avoid working at unprotected heights and dangerous moving machinery.  (R. at 120.)  Due to psychological-based factors, Plaintiff had some limitations, but could understand, remember, and carry out simple instructions, make simple decisions, and could concentrate for sufficient time to complete simple tasks; could accept instructions, but contact with co-workers and the public should be occasional and incidental to work performed; and could respond appropriately to changes in the workplace.  (R. at 120-121.)  At step four, he found that Plaintiff was not capable of performing any past relevant work.  (R. at 125.)  At step five, the ALJ noted that prior to the established onset date, Plaintiff was an individual closely approaching

24

advanced age.  (*Id.*)  On January 17, 2013, his age category changed to an individual of advanced age.  (*Id.*)  Prior to that date, considering his age, education, work experience, and RFC, there were jobs that existed in significant numbers in the national economy that Plaintiff could have performed. (R. at 125-126.)  Specifically, Plaintiff could have performed the jobs of a marker and an air purifier. (R. at 126.)  Beginning on January 17, 2013, however, there were no jobs that existed in the national economy that Plaintiff could perform.  (*Id.*)  Accordingly, the ALJ determined that Plaintiff was not disabled prior to January 17, 2013, but became disabled on that date, and has continued to be disabled through the date of his decision.  (*Id.*)

## II.   ANALYSIS

### A.   <u>Legal Standards</u>

#### 1.   **Standard of Review**

Judicial review of the Commissioner's denial of benefits is limited to whether the Commissioner's position is supported by substantial evidence and whether the Commissioner applied proper legal standards in evaluating the evidence.  *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994); 42 U.S.C. § 405(g).  "Substantial evidence is that which is relevant and sufficient for a reasonable mind to accept as adequate to support a conclusion; it must be more than a scintilla, but it need not be a preponderance."  *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995) (quoting *Anthony v. Sullivan*, 954 F.2d 289, 295 (5th Cir. 1992)).  In applying the substantial evidence standard, the reviewing court does not reweigh the evidence, retry the issues, or substitute its own judgment, but rather, scrutinizes the record to determine whether substantial evidence is present. *Greenspan*, 38 F.3d at 236.  A finding of no substantial evidence is appropriate only if there is a conspicuous absence of credible evidentiary choices or contrary medical findings to support the Commissioner's decision.  *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988).

The scope of judicial review of a decision under the supplemental security income program

is identical to that of a decision under the social security disability program. *Davis v. Heckler*, 759 F.2d 432, 435 n. 1 (5th Cir. 1985). Moreover, the relevant law and regulations governing the determination of disability under a claim for disability insurance benefits are identical to those governing the determination under a claim for supplemental security income. *See id*. Thus, the Court may rely on decisions in both areas without distinction in reviewing an ALJ's decision. *See id*. at 436 and n.1.

### 2. Disability Determination

To be entitled to social security benefits, a claimant must prove that he or she is disabled as defined by the Social Security Act. *Leggett*, 67 F.3d at 563-64. The definition of disability under the Social Security Act is "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). When a claimant's insured status has expired, the claimant "must not only prove" disability, but that the disability existed "prior to the expiration of [his or] her insured status." *Anthony*, 954 F.2d at 295. An "impairment which had its onset or became disabling after the special earnings test was last met cannot serve as the basis for a finding of disability." *Owens v. Heckler*, 770 F.2d 1276, 1280 (5th Cir. 1985).

The Commissioner utilizes a sequential five-step analysis to determine whether a claimant is disabled:

1.   An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.

2.   An individual who does not have a "severe impairment" will not be found to be disabled.

3.   An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors.

4.      If an individual is capable of performing the work he has done in the past, a finding of "not disabled" must be made.

5.      If an individual's impairment precludes him from performing his past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if work can be performed.

*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (summarizing 20 C.F.R. § 404.1520(b)-(f) (currently 20 C.F.R. § 404.1520(a)(4)(I)-(v) (2012)). Under the first four steps of the analysis, the burden lies with the claimant to prove disability. *Leggett*, 67 F.3d at 564. The analysis terminates if the Commissioner determines at any point during the first four steps that the claimant is disabled or is not disabled. *Id*. Once the claimant satisfies his or her burden under the first four steps, the burden shifts to the Commissioner at step five to show that there is other gainful employment available in the national economy that the claimant is capable of performing. *Greenspan*, 38 F.3d at 236. This burden may be satisfied either by reference to the Medical-Vocational Guidelines of the regulations or by expert vocational testimony or other similar evidence. *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987). After the Commissioner fulfills this burden, the burden shifts back to the claimant to show that he cannot perform the alternate work. *Perez v. Barnhart*, 415 F.3d 457, 461 (5th Cir. 2005). "A finding that a claimant is disabled or is not disabled at any point in the five-step review is conclusive and terminates the analysis." *Loveland v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

**B.**    <u>**Issues for Review**</u>

Plaintiff presents three issues for review:

1.    The ALJ failed to properly weigh the medical evidence.

2.    The ALJ failed to properly evaluate Plaintiff's credibility.

3.    The ALJ relied on flawed vocational expert testimony.

(doc. 12 at 5.)

**C.     Medical Opinion Evidence**

Plaintiff first contends that the ALJ erred in giving little weight to the opinions of Dr. Fehr, a treating physician.  (doc. 12 at 19.)  He contends that because Dr. Fehr's opinions were supported by appropriate clinical and diagnostic psychiatric evidence and are uncontroverted by other substantial evidence in the record, they are entitled to controlling weight.  (*Id.* at 21.)

The Commissioner is entrusted to make determinations regarding disability, including evaluating medical opinions and weighing inconsistent evidence.  20 C.F.R. §§ 404.1520b(b) and 404.1527(c)(2012).  Every medical opinion is evaluated regardless of its source, but the Commissioner generally gives greater weight to opinions from a treating source.  20 C.F.R. § 404.1527(c)(2).  A treating source is a claimant's "physician, psychologist, or other acceptable medical source" who provides or has provided a claimant with medical treatment or evaluation, and who has or has had an ongoing treatment relationship with the claimant.  *Id.* § 404.1502.  When "a treating source's opinion on the issue(s) of the nature and severity of [a claimant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence," the Commissioner must give such an opinion controlling weight.  *Id.* § 404.1527(c)(2).

If controlling weight is not given to a treating source's opinion, the Commissioner considers six factors in deciding the weight given to each medical opinion: (1) whether the source examined the claimant or not; (2) whether the source treated the claimant; (3) the medical signs and laboratory findings that support the given opinion; (4) the consistency of the opinion with the record as a whole; (5) whether the opinion is made by a specialist or non-specialist; and (6) any other factor which "tend[s] to support or contradict the opinion."  *See id.* § 404.1527(c)(1)–(6).  The "standard of deference to the examining physician is contingent upon the physician's ordinarily greater familiarity with the claimant's injuries.  [W]here the examining physician is not the claimant's

treating physician and where the physician examined the claimant only once, the level of deference afforded his opinion may fall correspondingly." *Rodriguez v. Shalala*, 35 F.3d 560, at *2 (5th Cir. 1994) (unpublished) (citing *Moore v. Sullivan*, 919 F.2d 901, 905 (5th Cir. 1990)).  A treating physician's opinion may also be given little or no weight when good cause exists, such as "where the treating physician's evidence is conclusory, is unsupported by medically acceptable clinical, laboratory, or diagnostic techniques, or is otherwise unsupported by the evidence." *Newton v. Apfel*, 209 F.3d 448, 456 (5th Cir. 2000).  If the evidence supports a contrary conclusion, an opinion of any physician may be rejected.  *Id.* at 455; *Bradley v. Bowen*, 809 F.2d 1054, 1057 (5th Cir. 1981) (per curiam).

A factor-by-factor analysis is unnecessary when "there is competing first-hand medical evidence and the ALJ finds as a factual matter that one doctor's opinion is more well-founded than another," or when the ALJ has weighed "the treating physician's opinion on disability against the medical opinion of other physicians who have treated or examined the claimant and have specific medical bases for a contrary opinion."  *Id.* at 458.  "[A]bsent reliable medical evidence from a treating or examining physician *controverting the claimant's treating specialist*, an ALJ may reject the opinion of the treating physician only if the ALJ performs a detailed analysis of the treating physician's views under the criteria set forth in [20 C.F.R. § 404.1527(c)]."  *Id.* at 453 (emphasis added).

While an ALJ should afford considerable weight to opinions and diagnoses of treating physicians when determining disability, the sole responsibility for this determination rests with the ALJ.  *Newton*, 209 F.3d at 455.  The ALJ's RFC decision can be supported by substantial evidence even if he does not specifically discuss all the evidence that supports his decision, or all the evidence that he rejected.  *Falco v. Shalala*, 27 F.3d 160, 164 (5th Cir. 1994).  A reviewing court must defer to the ALJ's decision when substantial evidence supports it, even if the court would reach a different

conclusion based on the evidence in the record. *Leggett*, 67 F.3d at 564. Nevertheless, the substantial evidence review is not an uncritical "rubber stamp" and requires "more than a search for evidence supporting the [Commissioner's] findings." *Martin v. Heckler*, 748 F.2d 1027, 1031 (5th Cir. 1984) (citations omitted). The court "must scrutinize the record and take into account whatever fairly detracts from the substantiality of the evidence supporting the [ALJ's] findings." *Id.* (citations omitted) Courts may not re-weigh the evidence or substitute their judgment for that of the Commissioner, however, and a "no substantial evidence" finding is appropriate only if there is a conspicuous absence of credible evidentiary choices or contrary medical findings to support the ALJ's decision. *See Johnson*, 864 F.2d at 343 (citations omitted).

Here, in assessing Plaintiff's RFC during the period at issue, the ALJ stated that he considered the evidence of record as well as all symptoms and the extent to which those symptoms could reasonably be consistent with the objective medical evidence. (R. at 121.) He outlined, albeit not in great depth, Plaintiff's psychiatric complaints, diagnoses, and treatment. (R. at 121-122.)

He also took into account Plaintiff's testimony regarding his impairments and the extent to which they could reasonably be expected to cause the alleged symptoms. (R. at 121.) After careful consideration of the evidence, however, he determined that they were not entirely credible. (*Id.*) He referenced Dr. Felkins's report in noting that although Plaintiff was diagnosed with an adjustment disorder, Dr. Vas refused to state he was disabled. (R. at 124.) Also "weighing against" Plaintiff was the fact that he went to jail for domestic violence caused by alcohol use. (*Id.*) The ALJ also took into account and considered the assessments and opinions of Dr. Fehr, Plaintiff's treating psychiatrist. (R. at 123-125.) He assigned considerable weight to Dr. Felkins's medical opinion and interrogatories because he believed them to be consistent with the medical evidence of record and more persuasive. (R. at 124-125.) The ALJ assigned little weight to Dr. Fehr's Psychological Impairment Questionnaire because she did not consider the fact that Plaintiff was non-compliant

with his treatment and because her progress notes did not support her own RFC.  (R. at 125.)

Because there was no medical evidence from a treating or examining source controverting Dr. Fehr's assessments, the ALJ was required to perform the six-factor analysis set forth in 20 C.F.R. § 404.1527(c)(1)-(6) before dismissing Dr. Fehr's assessments.  *See Newton*, 209 F.3d at 453-55.  Although the ALJ did not make a specific finding as to each of the factors set forth in 20 C.F.R. § 404.1527(c)(1), he specifically stated that he considered opinion evidence in accordance with the requirements of 20 C.F.R. §§ 404.1527 and 416.927. (*See* R. at 121.)  His decision reflects that he did consider the factors, as he reviewed Dr. Fehr's opinions (and the opinions of Dr. Felkins) and considered whether they were consistent with her treatment notes and the record as a whole, he considered the psychological and psychiatric medical signs and laboratory findings in the record, and he considered that Dr. Fehr treated Plaintiff.  (*See* R. at 122-125.)  The regulations require only that the Commissioner "apply the factors and articulate good cause for the weight assigned to the treating source opinion."  *See* 20 C.F.R. § 404.1527(c)(2); *Brewer v. Colvin*, No. 3:11-cv-3188-N, 2013 WL 1949842, at *6 (N.D. Tex. Apr. 9, 2013), *rec. adopted*, 2013 WL 1949858 (N.D.Tex. May 13, 2013); *Johnson v. Astrue*, No. 3:08-cv-1488-BD, 2010 WL 26469, at *4 (N.D. Tex. Jan. 4, 2010).  "The ALJ need not recite each factor as a litany in every case."  *Brewer*, 2013 WL 1949842, at *6.

Here, the ALJ's decision reflects that he properly weighed all the evidence, and his narrative discussion showed that he analyzed and took into account the treatment notes during the relevant period, the assessments made by the non-examining and non-treating psychiatric doctor, and Plaintiff's testimony at the hearings before the ALJ.  (*See* R. at 121-125.)

Plaintiff argues that the ALJ's conclusion that Dr. Fehr did not consider Plaintiff's purported non-compliance with treatment is pure speculation, and to the extent the ALJ was unclear whether Dr. Fehr did consider the issue, he was required to clarify the matter with the doctor or make his

concerns known to Plaintiff's attorney.  (doc. 12 at 19-20.)  He also argued that the ALJ failed to

consider if Plaintiff's mental impairments interfered with his treatment, and he was required to first

make a finding of disability and then determine if noncompliance was material to his finding.  (*Id.*

at 20.)

To the extent it was improper for the ALJ to take into account Dr. Fehr's failure to consider

Plaintiff's noncompliance with treatment in assigning little weight to her opinion, he also considered

the fact that her opinions were not supported by her progress notes. His contention that Dr. Fehr's

opinions were not supported by her progress noted combined with his review and analysis of the

objective record, apart from his contention that she did not consider Plaintiff's noncompliance,

satisfy his duty under the regulations and constitute "good cause" for affording little or no weight

to those statements in his RFC determination.[10]   *See Brewer*, 2013 WL 1949842, at *6 (finding the

ALJ's explanation as to why he did not give controlling weight to a treating physician's opinion

constituted "good cause" even though he did not make a specific finding as to each of the factors

set forth in 20 C.F.R. § 1527 (c)(2));  *Johnson*, 2010 WL 26469, at *4 (same); *Hawkins v. Astrue*,

No. 3:09-cv-2094-BD, 2011 WL 1107205, at *6 (N.D. Tex. March 25, 2011) (same); *Gomez v.

Barnhart,* No. SA-03-CA-1285-XR, 2004 WL 2512801, at *2 (W.D.Tex. Nov. 5, 2004) (finding the

ALJ complies with regulations if the resulting decision reflects that consideration was given to

medical consultant's opinion); *see also Hall v. Astrue,* No. 3:11-cv-1713-BH, 2011 WL 1042285,

at * 9 (N.D. Tex. March 21, 2011)(finding "[c]ourts have ... relied on medical records noting an

improvement with medication to find that the ALJ properly assigned little or no weight to a treating

---

[10]Even assuming the ALJ erred in taking into account Dr. Fehr's failure to consider Plaintiff's non-
compliance, the error was harmless and Plaintiff has not shown prejudice from it.  In the Fifth Circuit, harmless error
exists when it is inconceivable that a different administrative conclusion would have been reached absent the error.
*Bornette v. Barnhart*, 466 F.Supp.2d 811 (E.D.Tex. 2006) (citing *Frank v. Barnhart*, 326 F.3d 618, 622 (5th Cir.
2003)).  As outlined above, the ALJ had another reason for assigning little weight to Dr. Fehr's position, so it is
inconceivable that the ALJ would have reached a different conclusion absent the error.

physician's opinions.")(citing *Zimmerman v. Astrue*, 288 F.App'x 931, 935-36 (5th Cir. 2008)).

Accordingly, Plaintiff has failed to establish that remand is required on this issue.

**D**.     **Credibility**

Plaintiff next contends that the ALJ failed to properly evaluate his credibility. (doc. 12 at 22.) He claims that the ALJ failed to provide a single reason for finding his testimony regarding his mental impairment not credible despite the fact that it is clear that his mental impairments are the primary reason he cannot work. (*Id*. at 23.)

Social Security Ruling: SSR 96–7p requires the ALJ to follow a two-step process for evaluating a claimant's subjective complaints. SSR 96–7p, 1996 WL 374186, at *2 (S.S.A. July 2, 1996). First, the ALJ must consider whether the claimant has a medically determinable impairment that could reasonably be expected to produce the alleged symptoms. (*Id*.) Once such an impairment is shown, the ALJ must evaluate the intensity, persistence, and limiting effects of the alleged symptoms to determine the extent to which they limit the individual's ability to do basic work activities. (*Id*.) If the claimant's statements concerning the intensity, persistence, or limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the ALJ must make a credibility finding regarding the claimant's statements. (*Id.*); *Falco*, 27 F.3d at 164 (citing *Scharlow v. Schweiker*, 655 F.2d 645, 648–49 (5th Cir. 1985)).

The ALJ's credibility determination must be based on a consideration of the entire record, including medical signs and laboratory findings, and statements by the claimant and her treating or examining sources concerning the alleged symptoms and their effect. SSR 96–7p, 1996 WL 374186, at *2. The ALJ must also consider a non-exclusive list of seven relevant factors in assessing the credibility of a claimant's statements:

1.     the claimant's daily activities;
2.     the location, duration, frequency, and intensity of pain or other symptoms;
3.     factors that precipitate and aggravate symptoms;

      4.     the type, dosage, effectiveness, and side effects of any medication taken to alleviate pain or other symptoms;

      5.     treatment, other than medication, for relief of pain or other symptoms;

      6.     measures other than treatment the claimant uses to relieve pain or other symptoms (e.g., lying flat on his or her back);

      7.      and any other factors concerning the claimant's functional limitations and restrictions due to pain or other symptoms.

(*Id.* at *3.)

Although the ALJ must give specific reasons for his credibility determination, "neither the regulation nor interpretive case law requires that an ALJ name, enumerate, and discuss each factor in outline or other rigid, mechanical form. It suffices when the administrative decision is sufficiently specific to make clear that the regulatory factors were considered." *Prince v. Barnhart*, 418 F.Supp.2d 863, 871 (E.D. Tex. 2005). Moreover, the Fifth Circuit has explicitly rejected the requirement that an ALJ "follow formalistic rules" when assessing a claimant's subjective complaints. *Falco*, 27 F.3d at 164. The ALJ's evaluation of the credibility of subjective complaints is entitled to judicial deference. *See Carrier v. Sullivan*, 944 F.2d 243, 247 (5th Cir. 1991). The ALJ is in the best position to assess a claimant's credibility, since he "enjoys the benefit of perceiving first-hand the claimant at the hearing." *Falco v. Shalala*, 27 F.3d 164 n. 18 (5th Cir. 1994).

Here, the ALJ acknowledged that Plaintiff's medically determinable impairments could be expected to cause his alleged symptoms, but he concluded that his statements regarding the intensity, persistence, and limiting effects of his symptoms were not entirely credible. (R. at 121.) After consideration of the evidence, but not in a formalistic fashion, the ALJ addressed several of the credibility factors listed in SSR 96-7p, including Plaintiff's daily activities; the duration, frequency, and intensity of his symptoms; factors that precipitated Plaintiff's symptoms, such as alcohol use; and the type of medication he took. (R. at 119, 122, 124.) Although the majority of the ALJ's discussion does appear to be geared toward Plaintiff's physical symptoms, the ALJ did address Plaintiff's mental symptoms. (R. at 121-124.) He first noted that Plaintiff had depression and

testified that he had symptoms of worthlessness, inability to work, sadness, and loss of energy as well as anxiety attacks when he was around people.  (R. at 121.)  Plaintiff also testified that he had been treated by a psychiatrist for 2.5 years.  (*Id*.)

The ALJ mentioned that Plaintiff was initially diagnosed with an adjustment disorder and depressed mood on November 20, 2010, but notes dated December 8, 2010, indicated that he was capable  of working from a mental health standpoint.  (R. at 122.)  His mental examination was normal and had improved since the last examination, but it was noted that Plaintiff behaved in a way that suggested borderline intellectual functioning.  (*Id*.)  The ALJ also noted that Plaintiff presented with complaints of moods swings, depression, and anxiety on June 20, 2011.  (*Id*.)  On July 5, 2011, no psychomotor abnormalities were revealed, although Plaintiff's mood was anxious and his affect congruent.   (*Id*.)   He was assessed a GAF score of 55, which is indicative of moderate symptomology.  (*Id*.)

The ALJ also referenced Dr. Felkins's reports regarding Plaintiff's mental impairments where she noted that Plaintiff was diagnosed with an adjustment disorder, but he started on an antidepressant and was doing better by December 2010.  (R. at 124.)  His psychiatrist refused to state that he was disabled.  (*Id*.)  The ALJ found that weighing against Plaintiff was the fact that he went to jail for domestic violence caused by his alcohol use.  (*Id*.)  Also, Plaintiff started back on antidepressants in July 2011, and was seen again for the fourth time almost a year later in June 2012.  (*Id*.)  Although the psychiatrist noted that Plaintiff did not fill his antidepressant prescription, she refused to declare him disabled, as did his primary care physician.  (*Id*.)  Dr. Fehr saw Plaintiff in August of 2012, and changed his diagnosis to major depression and PTSD, and restarted his antidepressant.  (*Id*.)  Finally, on November 26, 2012, Plaintiff reported that he had not had any recent episodes of depression.  (*Id*.)

Additionally, the ALJ noted in his Step 3 analysis that Plaintiff indicated in his Function

Report that he read the Bible and watched the news.  (R. at 119.)  He had no problems with handling personal care, and he was able to make simple meals, iron his clothes, and take a bath.  (R. at 119-120.)  He utilized public transportation and shopped for food at the store.  (R. at 120.)

The ALJ's discussion shows that he relied primarily on the medical evidence of record to find Plaintiff not credible.  Although not in a formalistic fashion, he also considered the factors for determining credibility and adequately explained his reasons for rejecting Plaintiff's subjective complaints, and there is substantial evidence to support his determination.  *See Falco*, 27 F.3d at 164.  Therefore, remand is not required on this issue.

### E.    Flawed RFC and VE Testimony

Finally, Plaintiff argues that the ALJ relied on flawed VE testimony.  (doc. 12 at 24-26.)

#### 1.    *Flawed RFC*

Plaintiff first argues that the ALJ's finding is not based on substantial evidence as he failed to properly weigh the medical evidence or evaluate Plaintiff's credibility.  (doc. 12 at 24.)  Therefore, he contends that the VE's testimony in response to a hypothetical based on the flawed RFC finding is unreliable.  (*Id.*)

Residual functional capacity, or RFC, is defined as the most that a person can still do despite recognized limitations.  20 C.F.R. § 404.1545(a)(1) (2003).  It "is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis."  Social Security Ruling (SSR) 96-8p, 1996 WL 374184, at *1 (S.S.A. July 2, 1996).  An individual's RFC should be based on all of the relevant evidence in the case record, including opinions submitted by treating physicians or other acceptable medical sources.  20 C.F.R. § 404.1545(a)(3) (2012); SSR 96-8p, 1996 WL 374184, at *1.

The ALJ "is responsible for assessing the medical evidence and determining the claimant's residual functional capacity."  *Perez v. Heckler*, 777 F.2d 298, 302 (5th Cir. 1985).  The ALJ may

find that a claimant has no limitation or restriction as to a functional capacity when there is no allegation of a physical or mental limitation or restriction regarding that capacity, and no information in the record indicates that such a limitation or restriction exists. *See* SSR 96-8p, 1996 WL 374184, at *1. The ALJ's RFC decision can be supported by substantial evidence even if she does not specifically discuss all the evidence that supports her decision or all the evidence that she rejected. *Falco v. Shalala*, 27 F.3d 16, 164 (5th Cir. 1994). A reviewing court must defer to the ALJ's decision when substantial evidence supports it, even if the court would reach a different conclusion based on the evidence in the record. *Leggett*, 67 F.3d at 564. Nevertheless, the substantial evidence review is not an uncritical "rubber stamp" and requires "more than a search for evidence supporting the [Commissioner's] findings." *Martin v. Heckler*, 748 F.2d 1027, 1031 (5th Cir. 1984) (citations omitted). The Court "must scrutinize the record and take into account whatever fairly detracts from the substantiality of the evidence supporting the" ALJ's decision. *Id.* Courts may not reweigh the evidence or substitute their judgment for that of the Secretary, however, and a "no substantial evidence" finding is appropriate only if there is a "conspicuous absence of credible choices" or "no contrary medical evidence". *See Johnson*, 864 F.2d at 343 (citations omitted).

Here, the ALJ found that Plaintiff had the RFC to lift/carry 20 pounds occasionally; lift/carry 10 pounds frequently; sit/stand/walk for 6 hours out of an 8-hour workday; stoop, crouch, crawl, kneel, and balance occasionally; climb stairs occasionally; avoid climbing ladders; occasionally limited to working in temperature/humidity changes, dust, fumes, and gases; avoid working at unprotected heights and dangerous moving machinery; could understand, remember, and carry out simple instructions, make simple decisions; could concentrate for sufficient time to complete simple tasks; could accept instructions; occasional contact with co-workers and the public incidental to work performed; and could respond appropriately to changes in the workplace. (R. at 120-121.) In making his determination, he considered "all symptoms and the extent to which these symptoms

can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 CFR 404.1529 and 416.929 and SSRs 96-4p and 96-7p." (*Id.* at 121.)

As noted above, the ALJ's decision reflects that he properly weighed all the evidence in making his RFC determination, and there was substantial evidence to support his determination regarding Plaintiff's credibility.  He analyzed and took into account the treatment notes during the relevant period, the assessments made by the non-examining and non-treating doctor, and Plaintiff's testimony at the hearings before the ALJ.  (*See* R. at 121-125.)  He also considered the factors for determining credibility and adequately explained his reasons for rejecting Plaintiff's subjective complaints.  Therefore, the ALJ's decision is supported by substantial evidence.

### 2.    *Flawed VE Testimony*

Plaintiff also argues that the ALJ's hypothetical to the VE failed to accurately describe all of his recognized mental limitations.  (doc. 12 at 24.)  He contends that although the ALJ found Plaintiff had moderate difficulties in concentration, persistence, or pace, he did not include this restriction in his accepted hypothetical to the VE.  (*Id.*)  According to Plaintiff, the limitations in understanding, remembering, and making simple decisions; concentrating for a sufficient time to complete simple tasks; accepting simple instructions; and occasional contact with co-workers and the public incidental to work performed, failed to account for the broad moderate restrictions in concentration, persistence, or pace.  (*Id.* at 24-25.)

To establish that work exists for a claimant at steps four and five of the sequential disability determination process, the ALJ relies on the medical-vocational guidelines or the testimony of a VE in response to a hypothetical question.  *See Bowling v. Shalala*, 36 F.3d 431, 435 (5th Cir. 1994).  A hypothetical question posed by an ALJ to a VE must reasonably incorporate all the claimant's disabilities recognized by the ALJ and the claimant must be afforded a fair opportunity to correct

any deficiencies in the hypothetical question. *Id*. at 436. A claimant's failure to point out deficiencies in a hypothetical question does not "automatically salvage that hypothetical as a proper basis for a determination of non-disability." *Boyd v. Apfel*, 239 F.3d 698, 707 (5th Cir. 2001). If the ALJ relies on testimony elicited by a defective hypothetical question in making a disability determination, the Commissioner does not carry his burden of proof to show that a claimant could perform available work despite an impairment. *Id*. at 708.

Courts in this district have held that the ALJ is not required to explicitly include the claimant's functional limitations found in paragraph B in his hypothetical to the VE, as long as these limitations are adequately incorporated into the RFC, and the hypothetical "tracks" the RFC. *See, e.g.*, *Halterman*, 2012 WL 3764051, at *10; *Barr v. Astrue*, No. 311-CV-1349-BF, 2012 WL 2358307, at *6 (N.D. Tex. June 21, 2012); *Herring v. Astrue*, 788 F. Supp. 2d 513, 518–19 (N.D. Tex. Apr. 22, 2011); *Gipson v. Astrue,* No. 3:10-CV-1413-BK, 2011 WL 540299 at *6–7 (N.D. Tex. Feb.11, 2011). The Court agrees with this approach. The functional limitations found in paragraph B are simply used to rate the severity of the claimant's mental impairments at steps 2 and 3. SSR 96-8P, 1996 WL 374184, at *3 (S.S.A. July 2, 1996). The mental RFC assessment requires a more detailed analysis in which the ALJ itemizes the paragraph B limitations and expresses them in terms of work-related functions, including "the abilities to understand, carry out, and remember instructions; use judgment in making work-related decisions; respond appropriately to supervision, co-workers, and work situations; and deal with changes in a routine work setting." *See id.* at *3–6. Although the ALJ must consider the claimant's "paragraph B" functional limitations when determining the mental RFC, he is not required to incorporate them into his RFC assessment "word-for-word." *Westover*, 2012 WL 6553102, at *8; *Owen v. Astrue*, No. 3:10-CV-1439-BH, 2011 WL 588048, at *20 (N.D. Tex. Feb. 9, 2011). At later steps, when determining whether work exists for the claimant, the ALJ's hypothetical question to a VE must only "reasonably" incorporate the

claimant's disabilities that the ALJ recognized in his RFC assessment and are supported by the record. *See Bowling*, 36 F.3d at 436; *Halterman*, 2012 WL 3764051, at *10. Because the ALJ is not required to incorporate verbatim the paragraph B limitations into his RFC assessment, he should not be required to incorporate them verbatim into his hypothetical to the VE—as long as he accounts for them in his RFC assessment.

Here, at steps two and three, in considering the paragraph B criteria, the ALJ determined that Plaintiff had moderate difficulties in social functioning and maintaining concentration, persistence, or pace. (R. at 120.) He next determined that he had the mental RFC to understand, remember, and carry out simple instructions; make simple decisions; concentrate for sufficient time to complete simple tasks; accept instructions; only occasional contact with co-workers and the public incidental to work performed; and respond appropriately to changes in the workplace. (R. at 120-121.) At step five, the ALJ concluded that prior to January 17, 2013, Plaintiff had the physical and mental RFC to perform certain jobs existing in significant numbers in the national economy. (*See* R. at 125-126.)

In determining Plaintiff's mental RFC during the period at issue, the ALJ explained that the limitations identified in Paragraph B were not an RFC assessment, but were used to rate the severity of mental impairments at steps 2 and 3. (R. at 120.) He stated that his RFC assessment reflected the degree of limitation he found in the Paragraph B mental functional analysis. (*Id*.) He considered Plaintiff's statements that he was depressed, felt worthless, had a loss of energy, and was unable to work, and he noted that Plaintiff presented to medical professionals complaining of mood swings, anxiety, depression, and auditory hallucinations. (R. at 121-122.) He also adopted Dr. Felkins's opinion that Plaintiff had moderate difficulties maintaining concentration, persistence, or pace. (R. at 125.) In his RFC assessment, the ALJ limited Plaintiff to simple instructions, tasks, and decisions and occasional contact with co-workers and the public incidental to the work performed. (R. at 121.)

The ALJ essentially considered Plaintiff's limitation of moderate difficulty with regard to

concentration, persistence, and pace by limiting Plaintiff to understanding, remembering, and

carrying out simple tasks and instructions and occasional and incidental contact with co-workers and

the public.  His decision shows that he considered and incorporated Plaintiff's functional limitations

he found in paragraph B into his mental RFC assessment, and substantial evidence supports his

assessment.  The ALJ's hypothetical to the VE reasonably incorporated his functional limitations

because it "tracked" his RFC assessment.  (*See* R. at 83-84.)  Accordingly, the ALJ committed no

reversible error in presenting his hypothetical to the VE.  Substantial evidence therefore supports

his finding at step five that prior to January 17, 2013, Plaintiff could perform work that existed in

significant numbers in the national economy.  Remand is not required on this issue.[11]  *See Short*,

2013 WL 655020, at *5-6 (finding the ALJ was not required to expressly include a limitation for

concentration, persistence, or pace in his hypothetical to the VE where the record reflected that the

ALJ considered such limitations); *Berry*, 2013 WL 524331, at *22-23 (finding no reversible error

regarding the ALJ's RFC assessment and that the resulting hypothetical "reasonably incorporated"

the claimant's moderate limitation in concentration, persistence, and pace where it restricted him

to understanding, remembering, and carrying out short, simple instructions); *Downing*, 2012 WL

---

[11]Plaintiff cites *Voyles v. Astrue*, No. 3:10-CV-652-B, 2011 WL 825711 (N.D.Tex. Feb. 16, 2011), *rec. adopted*, 2011 WL 824764 (N.D. Mar. 4, 2011), for his contention that limiting an individual to jobs that require simple instructions fails to account for moderate restrictions in concentration, persistence, and pace.  The ALJ's restriction in this case was much more restrictive than in that case, where the ALJ asked the VE whether the jobs identified were "fairly simple, routine, [and] repetitive or involv[ed] simple, routine, repetitive type tasks." (*See* 2011 WL 825711, at *9).  Here, apart from the limitation that the hypothetical person be able to understand, remember, and carry out simple instructions, the ALJ also included the limitations that the hypothetical person sustain concentration and persistence for sufficient time to complete simple tasks; be able to interact appropriately with supervisors; have occasional contact with co-workers and public incident to the work performed; and be able to respond appropriately to changes in the workplace.  (R. at 83-84.)  Notably, recent decisions from this jurisdiction have declined to follow *Voyles*.  *See, e.g., Short v. Astrue*, No. 3:11-CV-713-N (BN), 2013 WL 655020, at *5-6 (N.D.Tex. Feb. 5, 2013), *rec. adopted*, 2013 WL 655022 (N.D.Tex. Feb. 22, 2013); *see also Berry v. Astrue*, No. 3:11-cv-02817-L(BH), 2013 WL 524331, at *22-23 (N.D.Tex. Jan. 25, 2013), *rec. adopted*, 2013 WL 540587 (N.D.Tex. Feb. 13, 2013); *Downing v. Astrue*, No. 2:11-cv-0170, 2012 WL 4354928, at *5 (N.D. Tex. Sept. 7, 2010), *rec. adopted*, 2012 WL 4354915 (N.D.Tex. Sept. 24, 2012); *Gonzalez v. Commissioner of Social Security Administration*, No 3:10-CV-2003-O-BF, 2012 WL 1058114, at *7 (N. D. Tex. Jan. 26, 2012), *rec. adopted*, 2012 WL 1065459 (N.D.Tex. Mar. 29, 2012).

4354928, at *5 (finding "[t]he ALJ's decision shows that he did consider the limitation of moderate difficulty with regard to concentration, persistence, and pace, *and included it in his RFC*, by limiting plaintiff to understanding, remembering and carrying-out simple tasks.")(emphasis in original); *Gonzalez*, 2012 WL 1058114, at *7 (finding "the ALJ did consider that 'paragraph B' limitation of moderate difficulty with regard to concentration, persistence, and pace, and included it, by its degree of limitation, in limiting Plaintiff to short and simple tasks and instruction" in his hypothetical question to the VE at the hearing); *see also Bordelon v. Astrue*, 281 F. App'x 418, 422–23 (5th Cir. 2008) (per curiam) (finding no reversible error where the ALJ's RFC assessment and resulting hypothetical "reasonably incorporated" the claimant's moderate limitation in concentration, persistence and pace by restricting him "to rare public interaction, low stress, and one-to-two step instructions," and noting that the claimant "failed to show any prejudice arising from the hypothetical question's omission of her [limitation]").

### III.  RECOMMENDATION

The Commissioner's decision should be **AFFIRMED**.

**SO RECOMMENDED** on this 28th day of March, 2015.

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE

**INSTRUCTIONS FOR SERVICE AND**
**NOTICE OF RIGHT TO APPEAL/OBJECT**

A copy of these findings, conclusions and recommendation shall be served on all parties in the manner provided by law. Any party who objects to any part of these findings, conclusions and recommendation must file specific written objections within 14 days after being served with a copy. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's findings, conclusions and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific. Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error. *See Douglass v. United Servs. Automobile Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE